William Carr the testator, having a wife and several children, viz. William, the defendant, his eldest son and heir at law, and others, plaintiffs, and being seised and possessed of an estate in lands, slaves and personal chattels, by will, dated August 2, 1760, after giving several specific legacies, bequeathed the residuum of his estate in tjiese words; ‘ all the rest of my estate, both real an d personal, not herein particularly mentioned, to be equally divided *133 between my wife and children, viz. Wiliam, Ann, Elizabeth, Charles, Agnes, Walter, Phoebe and Thomas; and I do hereby give the estate by this clause of my will devised, to my said wife and children, respectively, and to their heirs forever. Provided, nevertheless, that if either of my said children die before they arrive to the age of twenty-one years or marry, that their part given by this clause, be sold by my executors, and the money arising by such sale be equally divided among my wife, if living, and all my children or their representatives.’ By a codicil to his will annexed, dated August 12, 1760, he empowered his executors, of whom Southerland (a defendant) was one, to divide his personal estate according to his will. Within a fetv days afterwards, one Walter Chiles, having a considerable estate in lands, slaves and personal goods, died intestate, leaving, as his representatives, the children of two deceased sisters, viz. the testator William Carr, and his younger brothers and sisters, children of the eldest sister, and the defendant Southerland and his younger brothers and sisters, children of the youngest sister. Whereby the said William Carr, the testator, and the said Southerland, became entitled each to a moiety of the slaves of the said Chiles, paying to their brothers and sisters a proportion of their value. William Carr, the testaor, had notice of this accession to his estate, and died soon after without having altered or republished his will. And the question was, whether the slaves which descended to him, after making the will, should pass by the will or not ?
Wythe, for the plaintiffs,
that they would. He admitted that lands, which the devisor has not at the time of making the will, cannot by any words be made to pass under that will; and cited the cases of Buncker v. Cook, and Arthur v. Bockenham, reported in Gibb’s Law of Evidence, which depended on the same will, wherein this point was solemnly adjudged. A principal reason for this is drawn from the words of the statute of wills; ‘ every person having any manors, lands, tenements, or hereditaments, holden in Socage, &e. shall have full power to devise, &c.’ But this was made to give a testable quality only to those things which were not testable before, as lands, tenements, hereditaments, &c. But slaves were or would have been testable from their own nature; so that they are out of the purview of this statute. Another reason why the statute does not extend to them is, that the clause which gives full power of devising makes only ‘ manors, lands, tenements or hereditaments, holden in Socage,’ devisable. Now a slave is not a manor, land, or tenement, at all: it is indeed made a hereditament by a subsequent act of Assembly, but not of that kind described by the statute ; that is ‘ a hereditament hold-en in Socage.5 So that for this reason also, slaves have not their testable quality from the statute of wills, but from their own nature ; for the same reason the restriction of the statute formed by the word ‘ having,’ does not extend to them ; so that they may be considered as if that statute had never been made. They were then in their nature devisable. Then coinés an act of Assembly which makes them ‘ real estateof course they were now become ‘ real estate devisable.’ And this act having no restrictive words, future acquisitions of them might be disposed of by will, as well as of other subjects, whose testable quality had never been abridged. Such, for instance, are personal goods, which may confessedly be bequeathed, though not in possession of the testator at the time of making the will. So that, were we to consider slaves as real estate purely, those after acquired, would have passed in the present case.
But we will now consider what kind of estate they are, and to what rules they are subject. They are neither real nor personal purely, but are of an amphibious nature. Thus they are real where the proprietor dies intestate, but personal in every other instance. They are liable to execution for debts; marriage is an alienation of them; they pass by will as a chattel personal, and no remainder of them can be limited. In the present case, therefore, they should be considered as personal estate, because they resemble that as to their transient nature, and also as to the particular quality now under consideration, to wit, alienation by testament.
An important consequence of an adjudication against the plaintiffs would be, that negro children born after making the will, cannot be made to pass by that will; because they would to every intent be a new acquisition, as if added to the family by purchase. So that in large estates, where a child is born, perhaps, every day, the will must be solemnly republished every day, or the testator will die intestate as to part of his property. He therefore concluded, 1st. That if slaves were considered as real estate, future acquisitions of them might be devised. 2nd. But that, as to their testable quality they are personal estate, and, of course, may be so devised.
Pendleton, for the defendants,
said, that as it was admitted on the other side, that after acquired lands cannot be devised, so he would admit that personal chattels, in the same situation, might. And that the question was, whether slaves should be considered as lands or as personal chattels ? This question the act of Assembly has determined for us by making them real estate. By this alteration of their legal nature, they would have been rendered inde-visable; because by the common law of England no real estate could be devised. The statute of wills has made devisable such real estates as come within the description of ‘ manors, lands, tenements and hereditaments,’ and the act of Assembly which made slaves real, gave them expressly the heretable property, which brought them under the operation of the statute of wills as an he-reditament. Otherwise that act which took from them their testable, with their personal character, would have made them intes-table when it made them real, had it not superadded such a property as would bring them within the purview of the statute of wills. Nor does the objection weigh, that they are not a heredi-tament ‘holden in Socage,’ because the Socage tenure is mentioned by the statute only by way of example, and in contradistinction to tenures of a base nature, which were not intended to be made de-visable. If, therefore, slaves derive their testable quality from the statute of wills, they must take its subject to the restriction of the statute, that a person not 1 having,’ may not devise them.
There is another reason for the distinction between real and personal estate in the present case, besides that drawn from the statute of wills ; that is their nature and value. Lands are in their nature fixed and permanent, not experiencing that daily and hourly transfer from one owner to another, which personal chattels do. In their value they are greatly distinguished from chattels, in so much, as to render it well worth the testator’s attention to change his will when he changes his landed possessions, and to be too great to be thrown into a sweeping residuary clause. Now lítese reasons are applicable to property in slaves, which are not die subject of perpetual transfer from hand to hand, but live in families with us, are born and die on our lands, and, by their representatives, may continue with us as long as the lands themselves. Again in their value they are distinguished as lands, the slave being worth as much as the ground he cultivates. For this reason, our laws have put them on a footing with lands.
1 te answered the objection that a will must be republished on the birth of every new child, in order to pass it, by saying that slaves being considered as lands, the will speaks from the time of making it, and of course, by a devise of the mother her subsequent issue passes ; so that there is no such danger of a partial intestacy, l ie also strongly urged the case of Harrison v. Harrison, and endeavored to shew it could be determined on no other principle than the one now insisted on.
But he argued, that the slaves now in question could not pass, for a reason independent of their peculiar nature. The will of the testator is the efficacious principle in testamentary alienation; in support of that, words may do any thing; against it, they can do nothing. So that admitting whatever was the object of the testator’s mind when he penned this clause, might pass under it, we may well ask, could the testator, when making his will, have the slaves in question under his contemplation? Could he foresee, or reasonably expect, his uncle was to die before him ; that he should die intestate too; and that his own death would follow so closely as to leave him no leisure to enquire into the size and nature oí the accession to his estate ; to consider what would be a convenient disposition of it, and to make the necessary addition to his will ? We may say it is at least improbable he should have all this in view. His words are a further assurance he had not. For there is nothing future in them, nothing which discovers an extended prospect into futurity. They are merely present, ‘ all the rest of my estate,’ &c. If then these slaves made no part of the idea which he endeavored to express by the residuary clause ; he did not will them to pass, and therefore they did not pass.
John Randolph, Attorney General,
on the same side, mentioned what Lord Holt had somewhere declared to be the strongest reason why after acquired chattels should pass, and lands should not. Because, in the case of lands, if they did not pass by the will there was yet a person appointed by the law to take them, to wit, the heir; but if after acquired chattels were adjudged not to pass to the executor by the wills there could be* no person to take them, which would be an inconvenience. As Pendleton had insisted slaves were within the word ‘hereditament’ in the statute of wills, so he said they were within the word ‘ tenement’ in the same statute; and for a proof of this referred to† some passages in my Lord Coke’s comment on the Magna Charla.
Wythe’s reply,
as to its new matter, was confined principally to Harrison’s case, shewing that the residuary clause in that case was expressed so peculiarly as to exclude the slaves which came to the testator afterwards, and that the court went on that exclusion.
It was decreed the new acquired slaves did not pass under the will, by the opinions of Lee, Burwell, Fairfax, Page and Worm-ley, against the Secretary T. Nelson, and Byrd. The Governor gave no opinion.